We have our final case, Esner v. Buck's, Inc. Argument for the appellant. May it please the Court. Counsel. Good afternoon. My name is Mark Balagas. I represent the defendant and the appellant, Buck's, Inc. When I was in law school at the beginning of the first year, we had a contracts professor, an interesting fellow who was from the Caribbean. And he in turn was educated by the British. And he had a whole host of expressions that the Brits use for our common law. One of them always stuck with me 25 years later. And I think it's the one that most applies today. And he always said to us, intent is the key to the kingdom. Intent is the key to the kingdom. And that's where this case turns, on the intent of the parties. It's a contract case. Judge Crowder heard the evidence. Judge Crowder read the briefs. But I think she missed some things and selectively almost picked and chose some factors in the analysis. And that's where the error is. And that's why I'm asking the Court to reverse the case for trial. The nature of the dispute is simple. It's laid out in briefs. We've got premises that Ms. Essner is using as a retail contract operator of a gas station. There's a dispute about some back payments that are due. And a dispute about vacation of the premises. She gets a TRO, which is vacated 10 days later when she doesn't post the bond. In that time, my client serves her with a five-day notice, which is a condition proceeding to a forcible and detainer action. There's a dispute among two lawyers in their conversation on one single day, March 19, 2014. Mr. Civia, who represents Ms. Essner for this purpose. And an in-house general counsel for my client, Bucks. His name is Matthew Gannon. And there's no way to reconcile, absolutely no way to reconcile how these two lawyers came away from that phone call with a totally different understanding. Mr. Civia says the case is settled in a walk-away fashion, a mobile deal. We will release your claim, Essner's claims against Bucks. She says she has money claims. In exchange for Bucks releasing all of their claims, possession of property, money claims, claims for information, all sorts of things against Essner. Mannix says the opposite. Mannix says all I did was I said if you leave the premises, we will proceed with forcible action, which had not yet been filed. And then we'll continue negotiating regarding the money claims. Okay, she leaves the premises on the fifth day of her five-day notice. And there's testimony from my client that all she could do there was sell chips and things from the inventory, cigarettes from her inventory. She couldn't sell gas anymore. And the fifth day of her permission to stay there was expiring. Mr. Mannix says that's what we wanted. And there's a lot of talk in the brief filed by Ms. Essner that Mannix couldn't recall things, couldn't recall specifics. But he quite clearly in his deposition, which was admitted as part of my response brief by the court on my motion, he was asked by Mr. Marks, another attorney representing Ms. Essner, as of March 19, 2014, which is the date at issue, was there agreement as part of a global settlement that Bucks would allow Ms. Essner to vacate the premises? And Mr. Mannix testifies, yes, there was an understanding that she could vacate while conversations continued about other issues. And that's my position here today. And this was from a deposition that was admitted by the Secretary? Yes, Your Honor. And that's my position here today. They had a deal that you leave, we won't sue you for the forcible, and we'll try to keep talking regarding the money claims. I think the other thing that Judge Crowder did not consider, at least it's not talked about in her opinion, is the contract between the parties. There's a retail contract operators agreement. And it's attached to the verified common claim I ultimately filed with Bucks. And in paragraph 27, it says any modification or amendments of that agreement must be in writing and signed by both parties. It's not addressed at all in Ms. Essner's brief. It's not addressed at all in Judge Crowder's opinion. You know, one of the things that I didn't see addressed, and maybe I'm just helplessly ignorant of the issue, is this contract involved land. I mean, is there any requirement that it be reduced to writing just because it involved real estate? Did anybody look at that issue under the U.C.C.? I did look at that. I don't think so. Okay. The way they styled it was not as a lease, but rather she was a retail operator, meaning that she could sell goods that she owned, that she bought in her inventory, and sell them and keep the proceeds. She also, in this general terms, would sell gasoline owned by Bucks and keep a commission for it. So she did not own the real property, and her rights to it were just as I sort of specified. But when you amend it or you modify it, and Mr. Civia admitted at the evidentiary hearing that the agreement that he talks about was an amendment or a modification, it needs to be reduced to writing. And the reason is simple. We would avoid issues like we have today. So why didn't one of the parties start working on a lease? Because the case wasn't settled. That's why. And your client did not respond to the e-mail. No, the response was the counterclaim several weeks later. But that's a lawsuit. I mean, here you're getting an e-mail, we're settled, you do the release, and he says nothing. He's silenced. He says nothing. Basically, it gets sent to me that we can't reach a deal with Ms. Essner, proceed with the verified counterclaim. And we did. And that time period was only about- A verified counterclaim, but that already presumes the lawsuit's been filed. Right? Well, the lawsuit- If you're counterclaiming. The counterclaim comes because, you know, Essner actually was the plaintiff because she filed a motion for a TRO. So the counterclaim was the first pleading that my client filed as a defendant counterclaim. So there was a suit in progress. Even though the TRO was dissolved, Judge Crowder entered an order giving all parties a certain amount of time to file any other pleadings. Within that time, we filed a verified counterclaim. So you don't think silence is enough? I don't think so. Not under these circumstances and not given the short time period. I mean, if you compare the- and conduct is really, I think, the second part of the attempt, which is, I think, what you're going for. You know, Essner waits 10 months from the settlement until saying- the purported settlement orally until filing a motion to dismiss. My client waited five or six weeks between this move-out date, when they could go in there, look at the property and inventory, and there were some fixtures missing, things like that, to filing the claim for money damages. And that litigation, as I laid out in the brief, a laundry list of procedural things ensued. I mean, they filed a verified counterclaim. I moved to default her. She filed a verified answer for self-signing it. I propounded discovery. Essner herself signed interrogatory answers. Her lawyers filed 213 disclosures for witness interrogatories. She then files- signs her own name to the Rule 214 production responses. Well, she has to once you file a verified counterclaim. All subsequent pleadings have to be verified. Absolutely. So what point are you making about how she signs? My point that I'm making is that this isn't just the lawyer going through the motions on behalf of the client. It's the client herself and her own intent that's at issue here. No, but she has to sign. She has to. And I assume you and your client went through things and- We did. He signed or she signed. Absolutely, Your Honor. She has to sign. So I'm not- I don't see the significance of that, this part of your argument. I think the significance is that at any time along the way, she could have raised the claim of a purported oral settlement, either by way of motion to dismiss or affirmative defense, and she never did so. She never raised the issue as an affirmative defense to your counterclaim? Correct. Correct. There were no affirmative defenses filed. So how did the matter get resolved that there was a settlement? Because of your counterclaim to enforce? My counterclaim was on the money damages. The oral settlement agreement that Ms. Essner claims was never reduced to writing. She filed a motion to dismiss the counterclaim 10 months later saying, wait a minute, your counterclaim has already been released. That's her theory of the case. Okay. I apologize if I have this wrong, but I show that on June 25, 2014, your client filed a motion for default judgment- Yes. For failure to answer the counterclaim, a motion to answer discovery, and a motion to strike and dismiss her pleadings, right? That's correct. And then that very day, I think I have this right, correct me, Ms. Essner filed her verified answer to the counterclaim. Yes, ma'am. And that did not raise the affirmative defense of? Correct. She never filed any affirmative defenses. The first time she put her argument that the case had been settled globally before the court was 10 months after the purported settlement when she filed a motion to dismiss, I guess that would have been January of 2015. And we briefed that. As part of that, Judge Prater granted Ms. Essner's request for an evidentiary hearing, which was, I think, last September in Madison County. So you see from the briefing- She filed a motion to enforce the settlement in January of 2015. Correct. And that's the one I'm referring to, 10 months after when she says there was a global deal. If I may, the other issue, or the other thing I think that the discovery is significant is because I asked her questions in discovery about witnesses and about agreements and about communications that arguably call for facts or disclosures about this purported settlement agreement, yet she never identified any documents. You know, they wave around this email, this self-serving email from Attorney Sibbia that says, my client's willing to accept these terms, but they never say in discovery that this evidence is a settlement agreement. They never say in discovery that he or Jill Essner or anybody else is going to testify on the settlement agreement. And those interrogatories are in the record. Yes, ma'am. Yes, Your Honor. So, you know, her conduct undermines the claim that the case was dismissed or that the case was settled on a global basis, whereas Bucks has never acted inconsistently with its claim that the money damages claims were never, ever, ever settled or dismissed or released. You know, the issue about her writing is also important, too, because Mr. Sibbia, his email says, you know, she'll leave today, she's willing to accept these terms, and then we can work out the terms of a settlement agreement, sign it, and sign a dismissal. And the claim from the other side is, well, you never put together a dismissal or a settlement agreement. Well, nor did he, nor did anybody. No one ever exchanged a writing. So the question is, was a writing even called for? I see that in the case. Well, it was certainly contemplated. Sometimes things like money get in the way as to who's going to write it. But we don't know the answer to that. That would be speculation on our part. I don't think it's speculation, Your Honor, because the record shows Mr. Manning says, well, I never made that deal. So if he never made that deal, how is he supposed to then go put together an agreement to settle something that he says he never settled? I understand that. My concern, though, is he never responded to that email. I think if you look at his deposition and the testimony from Nicole Malick, who's the Executive Vice President of the company, they talk about he left that job around that time. Who did? Mr. Manning. Okay. Mr. Manning voluntarily. He basically wanted to work in D.C., and that's what he did. And Bucks is based in Omaha. This is all in the record, and I'm not trying to talk outside of the record. So Mr. Manning left the company shortly after. Yes, Your Honor. And then shortly after this claim of a settlement, I should say this, shortly after that email was sent and they settled the case, I became involved, frankly, and filed a counterclaim. I learned from the company that they had reached an impasse regarding the money, and this is after she left the premises. Because they were, you know, and the record is also clear, because I asked this of Mr. he agreed that he and I certainly never settled the case. Because if we had settled the case, I never would have signed a verified counterclaim. So I think, I mean, the time period between her leaving and filing the counterclaim is, I think it's five or six weeks. Respectfully, I don't think that that's that material. I think that that's, and the court gave us time to do it, and we filed it before that deadline. So the case was active. There never was a dismissal order, and there never was a motion to dismiss. Mr. Sivia talks at his testimony at his evidentiary hearing, well, it would have been dismissed administratively if no one had done anything. I don't know the rule that says that, but I suppose if no one showed up, it could be dismissed for want of prosecution. But it never got that far, because the counterclaim was timely. So there's no conduct by Bucks that's contrary to this point. It's the conduct of Ms. Essner and her lawyers, frankly, that's contrary to their claim that the suit was settled many months before. Now, what are the assignments of error? Well, one of them is that the contract before August, the retail contract operating agreement, says that any modifications or amendments need to be in writing. And the trial court did not address that at all. The contract was admitted in evidence. I had testimony at the evidentiary hearing about that specific paragraph. Mr. Sivia conceded that what he's talking about as an agreement or release of the money claims would constitute such an amendment, but yet there's nothing in Essner's brief and there's nothing in the court's opinion about it. The second thing about the writing is that Mr. Sivia's own email says, and I talked about this before, so I'll be brief, says that we'll work out the terms of a written settlement agreement, sign it, and we'll sign a dismissal too. So the deal is contingent on a writing. I'm not going to reiterate all the case law, but there's all sorts of cases that say if you make a contingent on a writing, you've got to have a writing. The law doesn't mean that you can't settle the case orally. We know you can. But in this case, his own email says we need a writing, and it just wasn't done. Thank you. What other assignments of error do you have in Judge Crowder's report? I think the evidence itself. It seems like she almost kind of picked and choosed some of the evidence. She relies very heavily on the fact that Jill Essner left the premises. I think my understanding, and I've read and reread the opinion, I think the crux of it is that she felt that Essner's action of leaving must have constituted some type of reliance, but I don't think that that's adequate when you look at the evidence as a whole. She left on the fifth day of the five-day notice. She had no cards to play. We know she had financial difficulties, and she had no purpose in being there anymore other than she could sell gas by court order, not just by the terms of the lease, the court order that she could sell inventory during the period of the TRO. And there's an order to this effect that's, I think, dated, oh, boy, I think it's the March 4th order. She could sell inventory, but she could not sell gasoline. That is in the court order. Well, the pumps were locked anyway, weren't they? Right. And, again, that's by court order. So all she could do there was sell chips and dip and things like that, which she's running out of. And Marcita Amistad-Vault, one of my witnesses, basically said that she went by there every day and it looked like they're packing up to her. It looked like they were what? They're packing up the store. Packing up. They're packing up the store. So I think Judge Crowder erred by finding that Ms. Essner departing the premises is enough to sort of solidify a deal when she ignored all the ñ Did they provide proof that the contractors had been paid? No. Did they give you that? No. No. Have they ever given you that? No, ma'am. Same with the lottery, same with the liquor license. You know, the mechanics liens were a big deal. It took a long time to ñ I mean, that's material. It took a long time to unwind that. The lottery issue, the liquor license, you know, the goal for Bucks is to get a new operator in there to sell gasoline so people don't start going elsewhere, and I think that's a legitimate business interest. Was a timely objection made to Attorney Sibby that he testified before the jury hearing? I did not object to him testifying. What I objected to him doing was acting as basically a trial attorney at the same hearing. But you made that objection twice, I think. Yeah, I did. I did. I filed the motion. I objected to him cross-examining my witness. I think I put that before the court before the hearing started, that I felt that it was inappropriate in this context. And the court basically denied it for purposes of the hearing but a reserve attorney future trial. But I still think, you know, it's ñ I read and reread the rule, and I think that it's ñ I think that was an error, frankly. Well, the court could find that his client would be unduly prejudiced if he didn't testify. Absolutely, Your Honor, I agree with that. And my response to that was she was represented primarily at that hearing by Mr. Marks, who's here today and did a wonderful job and had been part of the case with the depositions as well. So it isn't like he was coming fresh. Is that the same firm, though? Yes. It's my understanding they're in office at the same place, whether they're ñ I understand. I don't know that part. So how much was left to settle? You said there were money issues, the liquor license. I mean, how much really was not a part of the terms of the email? My understanding, there were ñ it was a request for information. There were issues about fixtures, which is still disputed. There's a dispute whether she was permitted to take the countertops and things like that. My people say, no, that's a fixture. You don't get to take it. My understanding is Ms. Essner took them for her own purpose, whether to sell them to another operator, I don't know. And then there were claims, of course, of the money. And what were the money claims? The money claims was back rent. The money claims was you didn't remit gasoline sale proceeds to us. She's supposed to sell gasoline. I think it's like you take a penny or two off of every dollar. And she had kept a few months of that, the rent. There were some NSF charges. Thank you very much. Thank you, counsel. Argument for the appellee. Good afternoon. May I please support Amanda Bradley for Jill Essner? Counsel. This is a very simple case in which Box is trying to confuse the standards of review for this court. In November, Judge Carter was asked whether a moral contract existed at all. The correct standard of review for this court would then be manifest weight, questions of fact. The trial court resolved them correctly. By looking at the affidavit of Mr. Manning, the deposition functioned like an affidavit, and the live testimony as to the two people that were there for the contract. The contract was formed on Wednesday, March 19, 2014. The facts are, on March 14, Ms. Essner tried to start her gas station business that day and was locked out. Rushed to court, got a TRO allowing her to sell gasoline. It expired 10 days later, on Friday the 14th. On Friday the 14th, she was served with a five-day notice to quit her business. She was then definitely locked out of her gasoline pumps. She continued to sell candy and cigarettes and soda from her gas station. She began preparing to leave. During this time, Mr. Civia and people from Fox, Manning, Ms. Mallett, another witness, and Ms. DeVault worked together to try to settle the case. On the afternoon of the 19th, it culminated in a phone call in which various ideas were exchanged. Mr. Civia then had to call Ms. Essner to get her approval. Mr. Manning also had to call one of his people to see if she could come to Mr. Civia's office to get the keys. Everything was finally settled. Mr. Manning himself testified that during that time, everybody was working towards a global walk-away settlement offer. He didn't remember the terms. He didn't remember when he sent exact emails. He didn't remember the details of the phone call, but he testified three times. Everybody was working towards a global settlement offer. We were walking away from everything, dollars-wise. Finally, at 5.38 p.m., Mr. Civia sent an email outlining what had been agreed to. We will accept. It was very informal. From there, for the next 23 days, nothing. Ms. Essner tendered her keys and left. Let me ask you a question. The email does not make any reference to money terms, which were obviously in dispute. So how do you enforce a settlement unless it has at least the material terms included? I recognize writing a release is procedural. You have to have all of the material issues in whatever you're trying to enforce. Here, it's an email. No money discussion at all. The email was to confirm what they discussed on the phone in the afternoon of the 19th. But there's still money issues. There's walk-away money issues. Bucks had agreed to release its money claims for back rent and for gasoline things. Not in here. That was what Civia testified to at trial. They would release their claims for back rent, for the back gasoline, for the bad checks. And Ms. Essner would release her claims against Bucks for the various things that they were owed. Like? She had repaired some things. Actually, under the retail contract agreement, some of the repairs fell to Bucks. She had paid for them, such as the electrician's repairs to the gasoline pumps, which were part of the outside gasoline property. But Ms. Essner had paid them. So I'm just wondering, how are you going to enforce the settlement if this court affirms Judge Crowder? How are you going to enforce the money terms? What's going to happen? You just won't talk about them and everybody walks away? That was the agreement. Bucks got what they wanted, which was their property back, and they wouldn't. And the money that they had gotten from Ms. Essner in the past was sufficient to cover against the claims that Ms. Essner could have asserted against Bucks. They would have equaled each other out. Rather than going through the uncertainties of litigation, as Ms. Civia testified, they said, you know what? It's close enough. We all walk away. Bucks has his property. The case closes. As of March 19th, the trial court in Madison County actually had no jurisdiction to do anything. There was no case. There was no case open. While there was a court date, there was no jurisdiction because there was no complaint filed by Essner. You lost me. How do we get jurisdiction? No jurisdiction but having a – I forgot what you said. Sometimes in Madison County, there will be a case management date set looking to see if a motion to reconsider has been filed. Or we all know that a new complaint will be filed just to ensure that it's been there. But we all know at that point in time, the court is acting with no jurisdiction. It happens in some of the other counties I practice in. So a court date was set for what? Case management. On what? To see if anybody had filed a claim at that point in time and to see if there was going to be any litigation. If nothing had been filed, it would have been administratively closed. Who would inform the court of that? If nobody showed up. How do you even let the court know, hey, you better give us a date. We might have something to file. That happened on the 14th when Ms. Essner did not have her bond. And the TRO was dissolved. And that's when they set that case management date. Okay. I see. Thank you. Right. So for 23 days, nothing. So March 19th to the middle of April, nothing. Waiting on the writing. An oral contract is reviewed under the manifest way because it is resolving the facts behind the oral contract. In which case, Judge Carter did resolve those facts correctly. Was there a meeting of the minds? Yes. They were working on a global settlement. Everybody walked away from each other. And that was it. Bucks got his property. Ms. Essner took her personal things. And we all went on the way. There was clear acceptance. Ms. Essner left. Bucks took his keys. This is unlike the Lovell case. A different Lovell case that was cited earlier. Where it was a potential settlement. And it was rejected very quickly. Instead, there was silence. For 23 days, silence. And truly, for closer to three months, there was no clear rejection. Nothing. Yes, a counterclaim did show up in the mail. But there was no clear, we didn't settle. No answer to this email. No, where are the lottery accounts? Where is our money? Where is anything? This email goes unanswered. How about the counterclaim? Did it allege those things? It alleged some property claims. Back rent, I believe, was among them. Some unpaid gasoline sales was among some of the damages. And it was not answered. Because Ms. Presidio believed the matter was settled. The terms were sufficiently clear and understood. Everybody has simply walked away. And the paperwork may follow. Everyone got valuable consideration. Bucks got his property much faster than if they had had to formally evict Ms. Essner. Ms. Essner did not have to quit her property on Wednesday, March 19th. Now, it is of note that the 20th was not a holiday that I can determine. It was a work day. It was a Thursday. It was not Easter. No one reached out on the 20th to correct Sivia. No one reached out on Friday. No one reached out the following week. Only in June, Sivia became aware. Potentially, this had been settled. Yet, every time he spoke with Bucks' counsel, we're going to settle this. And he was assured, yes. He testified about that. That was a question of fact. Again, the Crowder resolved correctly. The writing was not a conditioned precedent because they both changed their positions. There was an offer, acceptance, and everybody got their good and valuable consideration. No writing needed to follow. Everybody's positions had changed. Nothing needed to follow. The lottery and the liquor license are the personality of Ms. Essner, and they follow her. No one ever reached out to ask, Can we get some help on those lottery and liquor sales? Bucks argues that Essner should be equitably estopped from asserting that this matter is settled. Yet, they did not bring it up before the trial court, and their issue was waived. However, this court can affirm on the issue of equitable estoppel and resolve it against Bucks. For 23 days, there was silence. Thursday was a work day. Friday was a work day. And yet, they did not reach out. They cannot add terms because they were later unhappy at the time of the oral contract under Zafransky, a recent case where a sperm donor became unhappy because the egg donor may have used the eggs created at some future time to create genetic children. He wanted to stop her from implanting them. But that was not a term that was discussed at the time of their contracting. Just because you become unhappy later doesn't give you the right to add a term to an oral contract. The terms were clear as of March 19th. You had asked about the disqualification of counsel. The narrow issue before the court at the hearing was, was there a settlement agreement? Was there an oral contract that was stricken? There were two people that knew about the contract, Manning and Civia. Civia then conducted a cross-examination of DeVault. DeVault was one of the people who had been to Esmer's place of business to get some keys. The testimony she gave added nothing. If she had not testified, it would have added nothing. She neither favored nor disfavored Bucks. Bucks called her. Her testimony didn't add anything to the proceedings. Judge Carter did rule on that correctly. Moreover, the correct standard review would be the Abusive Discretion Review. Under Bauer, it's usually disfavored for an attorney to testify in his or her own case unless an exception does apply. The main exceptions would be if it's an undisgusted matter, an attorney may testify about the value of his or her services or if it would create a hardship. Again, the issue pending was the oral contract, and DeVault's testimony didn't change and didn't add. Furthermore, allowing this would not uproot the public confidence, which is what the rules of professional conduct would uphold. Coming back to the issue of waiver and estoppel, it truly clashed against Bucks. Their silence, their refusal to correct the misapprehension of Ms. Essner when she left on the night of the 19th by not picking up the phone, by not calling. Mr. Manning cannot find an email, cannot remember a phone call, cannot find a letter that he wrote after March 19th saying, oh, we need to discuss these terms. His recall was poor, it was vague. His silence, nothing was put into the record at all. Clearly shows the facts were resolved correctly and in favor of Ms. Essner. A settlement, an oral contract was reached where everybody walked away from any claims they may have on March 19th. Why didn't you guys raise the affirmative defense of settlement? I mean, you also were silent. We were. At the time that the counterclaim was received, it was believed that it was only done to preserve rights and that a writing was still going to follow and that an answer was a formality and required by court by rules. So you still can raise it, whether it's a formality or not. And do you have any emails that support that issue? I mean, were there continuing emails, continuing conversations between your client and Manning? Mr. Civia testified that every time or many times that he spoke with Box Counsel's office, he broached the settlements and was assured that settlement documents would soon be forthcoming. He testified about that on multiple occasions in his testimony at the hearing before Judge Crowder and in his deposition, which is in the record. And that would be subsequent to March 19th? Yes. And so he was assured that it would be coming and that it was a mere formality. So he was lulled into this. They gave up the property. They gave up their bargaining position. Box got what it wanted. And Asner believed it got what it wanted until it became apparent that Box actually intended to pursue money damages, at which time the only recourse was this. Again, Judge Crowder got it right. And under a manifest way of resolving all of the facts, this Court should affirm Judge Crowder's decision at the trial court level. Box has moved to supplement the record on appeal. Yes. The discovery responses. What's your position on that? The same argument. At trial, Box did not move those discovery responses into the record. They cannot, at the appellate level, fix the holes that they left at the trial level. Box, again at the trial level, said, I would like to move them in. Judge Crowder said, we will take care of that later and never rewrote the motion to have those admitted. Box did not. It is incumbent upon them at trial to ensure that their record is correct and full and complete for you at the appellate level. It neither helps nor hurts me what they say. They are found in the record at various places. However, you cannot bring a motion for that which you did not do at the trial level. The appellate court is one of review and not of initial jurisdiction as a general rule. Thank you. Based upon the briefs, it seemed there were four issues that were being discussed. One was possession. One was money, motor fuel sales, bank services, insufficient funds, liquidation of Essner's security deposit, what would happen with that, and Essner's claim that Box owed her money, so a money piece. Then the Illinois lottery account, liquor license, et cetera. And then the fourth was the physical condition of the premises. We see that it was going to be left broom clean, so to speak. Yes. She was going to surrender them that day. So we have two of the subject matters that are nowhere discussed in the e-mail, the money piece and the Illinois lottery mechanics liens, et cetera. How do you walk away from a mechanics lien proof, proof of a no lien? How do you walk away from that? It's my understanding that there were no mechanics liens that I have seen as part of the record. I know, but Box wanted proof of that, so that was just another piece of the discussion. So I've broken them down into four kind of general areas. Right. I don't know that there were any mechanics liens on the property as of that date. I believe, again, that as of that date they would be walking away. If there were any issues, such as the lottery account, that they needed help transferring it, because if the lottery account is between the person and the state, the liquor account or the liquor license is between the person and the state, they would reach out. They didn't. Thank you, counsel. Rebuttal. Mark Delacatis again for Box Inc. There's a few things I just want to talk about strictly in terms of rebuttal. The jurisdiction argument is sort of silly. Of course there's a trial court in jurisdiction. The case is pending. There's future orders. I don't think that goes anywhere. The standard review counsel raised, I have not argued that it's a weight standard regarding the evidence. The only thing I argued was that the court's construction of the parties' contract, the written contract before she went into the premises, is a date over review on whether that contract calls for a writing of modifications or amendments. That's all I'm trying to say there. But the rest of it is against the manifest way? Yes, Your Honor. Yes, Your Honor. But that contract, whether it calls for a writing or not, I believe the court reviews that as a fresh look. They know the look. She said something about. . . So you're saying that a settlement is a modification? Yes, absolutely. And that was the testimony of Mr. Sivia and from Ms. Mallard. But why can't you have a settlement with the intent of a written modification being brought? I think you can. And I think here he did state his email, we're going to write it down. He wrote that thing himself with no input from Manning. Sivia wrote more or less, you know, we're going to put together a release going forward, and we're going to both sign it, and then we're going to sign the dismissal. And that's all part of the agreement. Well, your client wrote an email at 358 saying that this woman would be at your office to retrieve the keys. Sure. Thanks. So there was a lapse of time between 3, 4 o'clock, let's say, and 538, which seems reasonable if you've got to contact your client to get approval. I agree. So you have this span of time, and the email says, I've talked to my client. I agree. And then you guys don't respond. I think what happened, Mr. Manning's email about my receipt of going to get the keys, the 358 email is consistent with what he says happened, which is the deal is we get the premises back, and we won't proceed with the forcible. There's nothing in his email that says, and I'm going to release the money claims. So I think they're actually, if you read them all together, they're consistent with what Bucks has been saying. You know, the email from Mr. Sidney. But the email at 538 says a full settlement. Right. Full settlement. Right. And then it discusses fixtures, which can easily be traded off for the money piece. It can, but it doesn't say that. And it also says, Mr. Sidney's email says, my client is willing to accept. Now, he said two things in his testimony. He said that sometimes he says, we settled it on the phone. At other times he says, they made an offer, I talked to my client, and I accepted it by email. Now, which is it? Which is it? You can't reconcile those two. You just can't. So he says, earlier emails, while they were negotiating in the weeks before all this went down, he uses the same kind of language. My client is willing to do this, willing to do that. And then when he says, we finally settled, he still says, we're willing to do this. It doesn't say, this confirms our agreement. It says, I'm willing to do it. And they did never reach that agreement. I have to address something in the brief, because counsel keeps saying that people from my firm reassured Mr. Sidney that the stuff's on the way. They used the term misrepresentation two times in the brief, and that's totally inappropriate. They used my name with it. They used lawyers in my firm that misrepresented things. We misrepresented nothing. Mr. Sidney says, well, you know, your people said they were working on it. If there were any talks, after the lawsuit was filed, there were talks about how much money can Ms. Essner pay. There were talks about money, and we never could reach a deal. But there were never any misrepresentations, and I can't let that go uncontested. You had a $10,000 security deposit from her? Yeah, I think it was $15,000, Your Honor, and the answer is yes. But that was kept by your client? Yes, it was. Yes, it was. The total money claims from Bucks were, I think, about $60,000 to $65,000. A thousand? A thousand. I did raise evidence of estoppel in the trial court level. In the response brief that Commissioner Smith brought it up, I brought up a ton of evidence during the evidence-sharing hearing about estoppel and waiver. So I think that issue has been covered. And that's about all I have. If there's any specific questions, I have some time to answer them. Otherwise, I would just thank the court for its attention and ask for the brief. Thank you. Thank you very much, Your Honor. Counsel, thank you for your briefs, your arguments. We will take this under advisement and issue a written accusation. Court will be in recess. All rise.